IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| BARRETTE OUTDOOR LIVING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-2008-E |
| | § | |
| FORTRESS IRON, LP, and | § | |
| FORTRESS FENCE PRODUCTS, LLC | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

On April 20, 2023, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 8,413,332 (the "'332 Patent"); U.S. Patent No. 8,413,965 (the "'965 Patent"); U.S. Patent No. 9,551,164 (the "'164 Patent"); and U.S. Patent No. 9,963,905 (the "'905 Patent") (collectively "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (ECF. Nos. 23, 48, 30, 50)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' filings are to the filing's number in the docket (ECF No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................. 3

II.     APPLICABLE LAW ......................................................................................... 4

III.    LEVEL OF ORDINARY SKILL IN THE ART ............................................. 9

IV.     THE PARTIES' STIPULATED TERMS ....................................................... 11

V.      CONSTRUCTION OF DISPUTED OR IDENTIFIED TERMS ................... 11

        A.   "boss" Terms ................................................................................... 11

        B.   "series of axles" ............................................................................. 23

        C.   "boss includes at least one rib" ..................................................... 25

        D.   "assemble to and connect" ............................................................. 27

        E.   "leading, inner edge of each rail is beveled to facilitate" ............. 29

        F.   "degree" Terms ............................................................................... 32

        G.   "picket openings" ........................................................................... 36

        H.   "sliding" Terms .............................................................................. 40

        I.    "causes" Terms ............................................................................... 48

        J.    "pivotal range" Terms .................................................................... 53

VI.     CONCLUSION ................................................................................................. 59

## I.    BACKGROUND

Plaintiff Barrette Outdoor Living, Inc. ("Barrette" or "Plaintiff") alleges that Defendants, Fortress Iron, LP, and Fortress Fence Products, LLC (collectively "Fortress" or "Defendants") infringes the '332 Patent, the '965 Patent, the '164 Patent, and the '905 Patent. Shortly before the start of the April 20, 2023 Hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The Assert Patents share a common specification and are titled "Fence/Rail Assembly with Concealed Sliding, Pivotal Connection, and Manufacturing Method Therefor." The Asserted Patents claim priority to Provisional Patent Application No. 61/151,122, which was filed on February 9, 2009. The specifications of the Asserted Patents state that the "present invention in general relates to fencing and railing systems, and in particular relates to connectors for fencing and railing systems." *See, e.g.*, '332 Patent at 1:18–20. More specifically, the specification summarizes a first exemplary embodiment as follows:

> [I]n a first example embodiment the present invention relates to a fencing/railing assembly adapted to be positioned between a pair of posts and mounted thereto. The assembly includes a plurality of pickets, a plurality of rails extending transverse to the pickets, and a connection between the pickets and the rails. The picket/rail connection is slidably mounted to the rail and pivotally connected to the picket to permit a sliding, pivotal motion. The sliding, pivotal connection allows the pickets to be oriented at greater angles relative to the rails (i.e., it allows the assembly to rack to a greater degree, thereby allowing the fencing/raining to follow more steeply changing terrain or contours).

*Id.* at 1:24–35.

Claim 1 of the '332 Patent is an illustrative claim and recites the following elements (disputed or identified terms in italics):

> 1. A method of manufacturing a fencing/railing assembly to be positioned between a pair of posts and mounted thereto, the method comprising the steps of:

providing one or more vertical pickets, each picket having an upper end and a lower end opposite the upper end, and having at least one pivot hole formed therein between the upper and lower end;

providing at least one connector strip, each connector strip having one or more *connector bosses* formed on a first side thereof and a *sliding surface formed on a second side* thereof opposite the first side;

pivotably connecting the at least one connector strip to the one or more pickets *by aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets*;

providing an elongate rail with a first end and an opposing second end, the elongate rail comprising at least an upper wall and a side wall, and further comprising *picket openings* spaced longitudinally along the upper wall; and

slipping the elongate rail over the one or more pickets so that the one or more pickets extend through the *picket openings*, and further slipping the elongate rail over the at least one connector strip so that the *sliding surface* of the at least one connector strip is *slidably engaged with* an inner surface of the side wall of the elongate rail and the at least one connector strip is concealed between the side wall and the picket;

whereby pivoting an upper end of one of the one or more pickets towards the first end of the elongate rail causes the at least one connector strip to slide along the inner surface of the side wall of the rail towards the second end of the elongate rail, and vice versa.

## II.    APPLICABLE LAW

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the

specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic*

*Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.  Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.  Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### III.      LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in

the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff contends that "a person of ordinary skill in the art would be someone meeting one of the following two criteria: a degreed engineer with two or more years of experience in the field of designing or manufacturing fences; or a person with five or more years of experience designing or manufacturing fences without having an engineering degree." (ECF. No. 48, pg. 20) (citing ECF No. 49, pgs. 210-213, 214-218).

Defendants contend that "the hypothetical person with ordinary skill in the art pertinent to the Patents-in-Suit holds a Bachelor of Science in Mechanical Engineering, a Bachelor of Science Degree in Civil Engineering, or a Bachelor Degree in a related field, and at least two years' experience working with multi-component mechanisms (more experience would balance less education and vice-versa)." (ECF. No. 23, pg. 15). Alternatively, Defendants contend that the "hypothetical person with ordinary skill in the art pertinent to the Patents-in-Suit may alternatively have at least 4 years' experience working with multi-component mechanisms without an advanced degree." *Id.*

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have a Bachelor of Science in Mechanical Engineering, a Bachelor of Science Degree in Civil Engineering, or a Bachelor Degree in a related field, and at least two years' experience

working with multi-component mechanisms. Alternatively, a person of ordinary skill in the art would have at least 4 years' experience working with multi-component mechanisms without an advanced degree. The Court notes that any differences in the parties' proposals do not appear to be significant for the purpose of claim construction.[3]

### IV.   THE PARTIES' STIPULATED TERMS

During the claim construction hearing, the parties agreed to the following construction:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "sliding"<br><br>('965 Patent: Claim 1)<br>('332 Patent: Claims 1, 6)<br>('164 Patent: Claims 1, 17)<br>('905 Patent: Claim 1) | "relative movement while in contact with another surface" |

The Court hereby **ADOPTS** the parties' agreed construction.

### V.   CONSTRUCTION OF DISPUTED OR IDENTIFIED TERMS

The Court addresses the meaning and scope of the following ten groups of terms/phrases in the Asserted Patents.

#### A.  "boss" Terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "boss" and "connector bosses" and "series of bosses" | Plain and ordinary meaning. | "an integral, fastener-less feature(s) extending from the surface of a part/connector" |

---

[3] Plaintiff previously filed a Motion to Strike Expert Witness Pratt (ECF No. 24) arguing that Dr. Pratt is not an expert in fencing. The Court denied Plaintiff's Motion. (ECF No. 47). Plaintiff also moved to strike to Defendants' Technology Tutorial during the Claim Construction Hearing. It is very common to submit a technology tutorial to a court in patent cases to provide the court with an opportunity to gain a general understanding of the technology. Here, the Court used the tutorial for that purpose, and did not use the tutorial to construe the disputed terms. Accordingly, further briefing on the matter is unnecessary, and Plaintiff's motion to strike Defendants' Technology Tutorial is DENIED.

| "aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets" | Plain and ordinary meaning. | "arranging the connector and the picket so that an integral feature extending from the surface of the connector forms a fastener-less but still pivotal connection" |
|---|---|---|
| "wherein each connector includes at least one projection" | Plain and ordinary meaning. | "wherein each connector includes at least one integral feature that forms a fastener-less but still pivotal connection" |
| "nub" | Plain and ordinary meaning. | "an integral, fastener-less feature extending from the surface of a connector" |

### 1. Analysis

The terms "boss," "connector bosses" and "series of bosses" appear in either Claims 1 and 7 of the '965 Patent; Claims 1 and 6 of the '332 Patent; or Claims 7 and 17 of the '164 Patent. The Court finds that the terms are used consistently in the claims and are intended to have the same general meaning in each claim. The phrase "aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets" appears in Claims 1 and 6 of the '332 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "wherein each connector includes at least one projection" appears in Claim 1 of the '905 Patent. The term "nub" appears in Claim 5 of the '965 Patent; and Claims 5 and 17 of the '164 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The parties dispute whether the terms "boss," "projection," and "nub" should be limited to being both "integral to the connector/connector strip" and "fastener-less," as Defendants propose.[4]

---

[4] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 16-19); Plaintiff's Opening Claim Construction Brief (ECF.

For the following reasons, the Court finds that the terms "boss," "projection," and "nub" should be limited to both "integral" and "fastener-less."

As an initial matter, the parties agree that the terms "boss," "projection," and "nub" are used interchangeably. (ECF Nos. 23, pg. 19; ECF No. 48, pg. 29). For example, Plaintiff states that "the Patents-in-Suit describe the 'boss' as 'projecting' and in the form of a 'nub, pin, or other protruding structure.'" (ECF No. 48, pg. 29). The Court agrees that the intrinsic evidence uses the terms "boss," "projection," and "nub" interchangeably. For example, the specification uses the term "projection" interchangeably with "boss" by stating that "[t]he connectors … *can include small projections (e.g., bosses)* that extend from one surface thereof and engage holes (e.g., recesses) formed in the pickets." '965 Patent at 1:41–44 (emphasis added). Likewise, the specification uses the terms "nub" and "boss" interchangeably. For example, the specification states that the connector strip "includes a single boss/nub." *Id.* at 5:14–15; *see also id.* at 4:44–47 ("bosses/nubs 36"), 4:59–62 ("five bosses/nubs 36"), 4:6–12 ("boss strip 34 includes at least one inwardly extending boss (e.g., a nub, pin, or other protruding structure) 36"). Accordingly, the Court finds that the intrinsic evidence indicates that the terms "boss," "projection," and "nub" should be construed the same.

Regarding the issue of whether the terms "boss," "projection," and "nub" should be limited to "integral to the connector/connector strip," the Court finds that the patentees limited the terms during prosecution of U.S. Patent No. 9,151,075 ("the '075 Patent"). (Court Exhibit 1). The '075 Patent is the parent application to the Asserted Patents. Thus, the patentees' statements and assertions in distinguishing the '075 Patent's claims over various prior art references is highly

---

No. 48, pgs. 28-31); Defendants' Reply Claim Construction Brief (ECF. No. 30, pgs. 8-12); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).

relevant to the claim language of the Asserted Patents. *See, e.g., Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1371 (Fed. Cir. 2014) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation") (quoting *Elkay Manufacturing Co. v. EBCO Manufacturing Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999)); *see also, Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368–69 (Fed.Cir.2007) (construing claim language based on statements made during prosecution of parent application regarding similar claim language).

Specifically, the examiner rejected the claims of the '075 Patent as being unpatentable in view of U.S. Patent Application No. 2009/0065755 to Sherstad ("Sherstad"). (Court Exhibit 2). Referencing Figures 8A and 15 from Sherstad, the examiner argued the following:



(Court Exhibit #2, Figures 8A and 15) (highlight added)

> As to (A), Sherstad teaches a connector **130** comprises an elongate strip **134/136** having a boss **150** extending from a side thereof and received within a pivot hole **50** of a picket to permit pivoting motion therebetween, wherein the boss comprises a circular nub and the picket openings are circular for receiving such nubs.

(Court Exhibit 3, pg. 10) (Final Office Action dated 01-13-2014).[5] In response, the patentees amended independent Claims 1 and 12, and argued as follows:

> With respect to Sherstad, the Examiner asserts that it discloses a connector with a boss. But in fact what is disclosed is simply a conventional pivot hole and pivot pin assembly, with the "boss 150" referred to in the Detailed Action in fact actually being a through-hole that receives a loose pin member 148. This is not a slip-together connection with the claimed integral boss (for quick and easy assembly). Furthermore, and significantly, the clip member 130 is not mounted to provide sliding, pivotal connection between the pickets and the rails, as is claimed. Instead, it provides only pivotal motion. And the claimed invention is not this same type of simple pivotal connection between pickets and rails, but instead a sliding, pivotal connection between the pickets and the rails. As such, there is no disclosure, teaching, or suggestion to substitute in the pivot-pin assembly of Sherstad, and even if there was the resulting structure would not include the claimed integral boss and as such would not provide the same slip-together functionality.
>
> For at least these reasons, Claims **1** and 12 are believed to be in condition for allowance. Claims 2, 4-11, 13-18, and 21-22 depend from Claims 1 and 12, so these dependent claims are in condition for allowance too.

(ECF No. 23-1, pgs. 176-177) (highlight added). The amended Claims 1 and 12 do not explicitly recite an "integral" boss, but instead only recite "bosses." (Court Exhibit 4, pgs. 4, 7) (Response to Final Office Action dated 01-13-2014). However, this is the nature of prosecution history

---

[5] The Court takes judicial notice of the referenced Office Actions and Responses, which can be found at https://patentcenter.uspto.gov/#!/. The Office Actions and Responses are entered with this Order as Court Exhibits. Citations to the exhibits are to the page numbers assigned through ECF.

disclaimer, because it prevents the patentees from capturing claim scope they surrendered by argument. As indicated above, the patentees distinguished their "claimed integral boss" from a simple "conventional pivot hole and pivot pin assembly." To be sure, the patentees argued that "the 'boss 150' [in the reference] referred to … [is] in fact actually being a through-hole that receives a loose pin" and that "[the pivot pin configuration] is not a slip-together connection with the claimed integral boss." By distinguishing "the claimed integral boss" from a simple "conventional pivot hole and pivot pin assembly," the patentees clearly and unmistakably disavowed any construction of "boss" that does not require it to be "integral to the connector/connector strip."

Indeed, the patentees further distinguished the claim in response to a Final Office Action. Specifically, the patentees amended the claims to require a connector strip with a plurality of bosses formed therein. For example, Claim 1 was amended as follows:

1. (Currently Amended)    A fencing/railing assembly adapted to be positioned between a pair of posts and mounted thereto, the assembly comprising:

a plurality of pickets;

a plurality of rails extending transverse to the pickets; and

one or more pivoting, sliding, concealed connectors for connecting the pickets to the rails, the one or more connectors being slidably mounted to the rails and being pivotally connected to the pickets to effect a sliding, pivotal connection between the pickets and the rails in such a manner that the pivotal range of the pivoting of the pickets relative to the rails is not limited by interaction of the one or more connectors with the pickets, wherein the pickets each have at least one pivot hole formed therein, the one or more concealed connectors comprise one or more elongate connector strips slidably captured by the rails, and the connector strips each has a plurality of bosses extending from one side thereof and receivable within the pivot holes in the pickets to permit a pivoting motion between the connector strip and the pickets.

(ECF No. 31, pg. 57) (Response to Final Office Action dated 06-08-2012). The patentees argued that the amendments distinguished the claims over U.S. Patent No. 3,258,251 to Culter ("Culter") (ECF No. 31, pgs. 84-91), which was cited by the examiner as prior art. The examiner relied on Culter as disclosing a pivotal connection between the connector and a picket. Specifically, the examiner stated the following:



Culter teaches a fence assembly comprising a plurality of pickets **A** and rails **B** extending transverse thereto, and at least one sliding, concealed, pivoting connector **21** for connecting the pickets **A** to the rails **B**, wherein the connector includes a circular nub

> **22** that is received in a circular opening, such that the pivotal range of the pivoting of the pickets relative to the rails is not limited by interaction of the one or more connectors with the pickets.  (C1, L43).  Culter further teaches that by making the fence pivotally adjustable enables its erection upon variable ground inclinations or step slopes.  (C1, L44-45).

(ECF No. 31, pgs. 72-73; Cutler at Figure 9 (ECF No. 31, pg. 85) (highlight added)). The patentees responded by explaining the claim amendments discussed above:

> However, to speed the prosecution of this application, Applicant has amended the independent claims to provide additional grounds for distinguishing them over the proposed combinations.  In particular, Claim 1 and Claim 12 have been amended to call for the connectors to comprise a connector strip with bosses formed therein for being received into recesses or holes formed in the pickets.  This is not shown in the Culter reference, nor is there any teaching in the prior art of how one could modify the Schall connection to be a sliding, pivotal connection and utilize the claimed bosses and recesses.   Accordingly, it is respectfully submitted that the amended claims are in full condition for allowance.

(ECF No. 31, pg. 66) (highlight added). As indicated, the patentees explicitly argued that the claims "have been amended to call for the connectors to comprise a connector strip with bosses formed therein," and affirmatively stated that "[t]his is not shown in the Culter reference." As indicated by the examiner, Cutler discloses a separate rivet 24 being passed through a dimpled hole 22 to provide a plurality of pivot points. (ECF No. 31 at 85) (Cutler at Figure 9). The patentees clearly and unmistakably argued that Cutler failed to disclosed the recited "connector strip with bosses formed therein." It is well established that "[a] patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (affirming the district courts narrow construction of the term "separate"

because of the patentee's statements made to differentiate its invention over the prior art). Accordingly, the Court finds that the terms "boss," "projection," and "nub" should be limited to "integral to the connector/connector strip."

In response to this issue, Plaintiff contends that the specifications "describe that the boss can be an integral part of the connector strip (as shown in the various drawings of the patent) *or can be a separate item such that the connector is made up of a strip with holes in it and pins that extend through the holes and into holes in the pickets.*" (ECF No. 48, pg. 29) (emphasis added). According to Plaintiff, the pickets and connector strips in the accused products have holes in them, and rivets are placed into these aligned holes. (*Id.* at 29). Plaintiff further contends that "the Patents-in-Suit describe the 'boss' as 'projecting' and in the form of a 'nub, pin, or other protruding structure' and describes that the boss can be an integral part of the strip *or can be a non-integral part of the strip.*" (*Id.*) (emphasis added). Plaintiff argues that a "boss" in the context of the Asserted Patents is simply "a projection or protrusion." (*Id.*).

The Court agrees that the specification discloses an embodiment where the boss is not integral to the connector. *See, e.g.*, '965 Patent at 4:15–18 ("In another alternative embodiment, aligning pivot holes are formed in the connector strip and the picket, a pivot pin is provided, and the two ends of the pivot pin are inserted into the two pivot holes."). Furthermore, the Court is cognizant that "there is a strong presumption against a claim construction that excludes a disclosed embodiment." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011). However, the Court finds Plaintiff's arguments unpersuasive, because they fail to address the most relevant intrinsic evidence as it relates to this issue.

Specifically, Plaintiff did not respond, address, or even mention the prosecution history in its briefing. *See Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) ("Any

explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention.'") (internal citation omitted). This is problematic given the arguments made by the patentees to distinguish the prior art. *See SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1379 (Fed. Cir. 2021) (affirming the district court for holding that a patent applicant's argument based distinction over a reference constituted a disclaimer of the distinguished claim scope). Indeed, it was exactly these arguments that clearly and unmistakably indicated that the scope of the claims where limited to embodiments where the boss is "integral to the connector/connector strip." *Litton Sys. v. Honeywell, Inc.*, 145 F.3d 1472, 1474 (Fed. Cir. 1998) ("Public notice of the scope of the right to exclude, as provided by the patent claims, specification and prosecution history, is a critical function of the entire scheme of patent law."). Accordingly, the Court rejects Plaintiff's argument and proposed construction.

Regarding the issue of whether the terms "boss," "projection," and "nub" should be limited to "fastener-less," the Court finds that the intrinsic evidence indicates that the terms should be limited as Defendants propose. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); *but see Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal."); *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) ("[C]omparing and contrasting the present technique to that of the prior art does not 'rise to

the level of [a] clear disavowal' of claim scope.") (quoting *Thorner*, 669 F.3d at 1366).

Here, the specification describes the "fastener-less" aspect of the boss as being advantageous over the prior art, and criticizes the prior art for requiring fasteners. *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary or description of the invention describes a feature of the invention … and criticizes other products … that lack that same feature, this operates as a clear disavowal of these other products (and processes using these products)."). Specifically, the specification states the following:

> As demonstrated by comparing a known prior art railing assembly (FIGS. 7A-7B) to the present invention (FIGS. 7C-7D), it can be seen that *the present invention* is better able to pivot the pickets relative to the rails in comparison to known railing assemblies. For instance, *known railing assemblies incorporate screws S and/or bolts* to rotatably couple pickets P to rails R, as shown in FIGS. 7A-7B. *Such couplings are time consuming to install and only allow for a limited range of rotation* and little if any horizontal movement. In fact, the known railing assembly of FIGS. 7A-7B only allows the pickets to rotate about 15 degrees in either direction before being obstructed by the edge of the picket opening.
> *In stark contrast, the present invention* utilizes a sliding pivotal connection between the pickets 20 and the rails 30 *that is very easy and fast to install* and allows for limited horizontal movement of the pickets 20 along the rails 30.

('965 Patent at 5:51–67) (emphasis added). Similarly, the specification states that "[t]he connectors … can include small projections (e.g., bosses) that extend from one surface thereof and engage holes (e.g., recesses) formed in the pickets," which "*[a]dvantageously, … provides a fastener-less but still pivotal connection*." (*Id.* at 1:41–46) (emphasis added). Likewise, the specification states that "[t]he connection is also achieved *without the use of any threaded fasteners*." (*Id.* at 4:35–40) (emphasis added). As indicated in the intrinsic evidence, common fasteners in the field of designing or manufacturing fences includes screws, bolts, and rivets. (*Id.* at 5:55–58; *see also* ECF No. 31, pg. 86 (Cutler at 2:44–50)). As further indicated by the specification, it is advantageous to use a "fastener-less" boss, projection, or nub, because they are easier and faster to install.

The Court fully appreciates the challenge with determining the fine line between

construing the claims in the light of the specification and improperly importing a limitation from the specification into the claims. *See Phillips*, 415 F.3d at 1323. It is always the Court's goal to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention. *Id.* at 1323-24. Here, however, when the claims are read in the light of the specification, a person of ordinary skill in the art would understand that the intrinsic evidence requires the "boss," "projection," and "nub" to be "fastener-less," because the patentees disparaged the prior art that required fasteners.

The patentees stated that using fasteners was "[i]n stark contrast [to] the present invention [that] utilizes a sliding pivotal connection … that is very easy and fast to install." ('965 Patent at 5:64–66). In other words, the Court recognizes that the patentees disavowed a "boss," "projection," or "nub" that included a fastener feature, because "the specification distinguishes or disparages prior art based on the absence of that feature." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). Accordingly, the Court finds that the terms "boss," "projection," and "nub" should be limited to "fastener-less."

Having resolved the parties' dispute regarding the terms "boss," "projection," or "nub," the Court gives the remaining claim language identified by Defendants for these terms/phrases their plain and ordinary meaning. For example, the disputed phrase "aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets" is unambiguous and is easily understandable by a jury when the term "bosses" is construed. Likewise, the phrase "wherein each connector includes at least one projection" is also unambiguous and is easily understandable by a jury when the term "projection" is construed.

Indeed, Defendants failed to provide a persuasive reason for redrafting the remaining claim language as they prefer. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We, however, recognize that district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also, U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy."). Accordingly, the Court gives the phrase "aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets," and the phrase "wherein each connector includes at least one projection" their plain and ordinary meaning. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in the light of the intrinsic evidence.

## 2.  Court's Construction

For the reasons set forth above, the Court construes the terms **"boss," "projection,"** and **"nub"** to mean **"protruding structure that is fastener-less and integral to the connector/connector strip,"** and the term **"bosses"** to mean **"protruding structures that are fastener-less and integral to the connector/connector strip."** The phrase **"aligning and inserting a respective one of the one or more connector bosses into the at least one pivot hole formed in each of the one or more pickets,"** and the phrase **"wherein each connector includes at least one projection"** are given their **plain and ordinary meaning.**

## B.  "series of axles"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "series of axles" | Plain and ordinary meaning. | "series of integral, fastener-less features extending from the surface of a connector" |

### 1. Analysis

The parties dispute whether the term "series of axles" should be limited to "integral to the connector/connector strip" and "fastener-less," as Defendants propose. [6] The term "series of axles" does not appear in the specification, and only appears in dependent Claim 5 of the '905 Patent. Generally, an axle is a cylindrical shaft that allows other components to rotate around it, much like a pivot pin. However, as discussed above for the disputed terms "boss," "projection," and "nub," the patentees distinguished the "claimed integral boss" from "a conventional pivot hole and pivot pin assembly" during prosecution of the '075 Patent. Thus, for the reasons discussed above for the terms "boss," "projection," and "nub," the Court construes the term "series of axles" to mean "series of protruding structures that are fastener-less and integral to the connectors." Indeed, independent Claim 1, from which Claim 5 depends, recites that the "connecter includes at least one projection."

Defendants further argue that there is no disclosure in the specification for both "at least one projection" and "a series of axles" on the same connector strip. The Court generally agrees and notes that Plaintiff did not provide any briefing for this specific term. To the extent that a party contends that the doctrine of claim differentiation applies, the Court notes that claim differentiation only creates a presumption that can be "overcome by a contrary construction dictated by the written description or prosecution history." *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Here, the weight of the intrinsic evidence overcomes the claim differentiation presumption that the term "series of axles" should be construed differently than "projection." To find otherwise, would be to allow the patentees to recapture embodiments disclaimed during prosecution.

---

[6] Defendants were the only party to brief this term (ECF. No. 23, pg. 20).

## 2. Court's Construction

For the reasons set forth above, the Court construes the term **"series of axles"** to mean **"series of protruding structures that are fastener-less and integral to the connectors."**

### C. "boss includes at least one rib"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "boss includes at least one rib" | Plain and ordinary meaning. | "a perpendicular extension from an integral, fastener-less feature extending from the surface of a part/connector" |

## 1. Analysis

The phrase "boss includes at least one rib" appears in Claims 16 and 20 of the '164 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "boss" should be limited to "integral to the connector/connector strip" and "fastener-less," as Defendants propose.[7] The parties also dispute whether the recited "one rib" must be a "perpendicular extension."

The issue regarding whether the recited "boss" is limited to a "protruding structure that is fastener-less and integral to the connector/connector strip" was resolved above. The Court's construction applies equally to the use of the term "boss" in this disputed phrase. Defendants note that the claim reads in pertinent part that "boss includes at least one rib to retain the boss in the respective pivot hole of the respective picket." Defendants argue that the "retain the boss" language indicates that the independent claim that the "rib" claims depends from encompasses a boss that does not have an integral retaining mechanism. (ECF No. 23, pg. 21). Defendants further argue that this is consistent with their proposed construction for "boss" since fasteners would typically include a fastening mechanism to retain themselves within a hole (*e.g.*, the threads on a

---

[7] Defendants were the only party to brief this term (ECF. No. 23, pg. 21).

screw). *Id.* The Court generally agrees.

However, Defendants do not provide any arguments on why the recited "rib" should be limited to a "perpendicular extension." Figures 9-14 illustrate "ribs 250" that are perpendicular to the boss.



('965 Patent at Figures 9-13). Contrary to Defendants' construction, however, the specification makes clear that "[i]t will be understood that the dimensions shows in FIGS. 9-13 are representative of typical commercial embodiments and are not limiting of the invention; the connector boss strip 234 can be provided with other dimension ins larger or smaller sizes." (*Id.* at 6:36–40). Accordingly, Defendants failed to provide any reason, much less a persuasive reason, to limit the rib to one of the disclosed embodiments. *Thorner*, 669 F.3d at 1365 ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term.") (quoting *Helmsderfer v. Bobrick Washroom Equip.*, Inc., 527 F.3d 1379, 1381 (Fed. Cir. 2008)). Here, the

patentees clearly expressed that the term "rib" should not be limited to the disclosed embodiment. Accordingly, this phrase should be given its plain and ordinary meaning, with the understanding that the Court's construction for "boss" applies to this phrase.

### 2. Court's Construction

For the reasons set forth above, the phrase **"boss includes at least one rib"** is given its **plain and ordinary meaning.**

### D. "assemble to and connect"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "assemble to and connect" | Plain and ordinary meaning. | "locating the picket with respect to the connector using the integral, fastener-less feature(s) extending from the surface of the connector" |

### 1. Analysis

The term "assemble to and connect" appears in Claims 1 and 17 of the '164 Patent; and in Claim 1 of the '905 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "assemble to and connect" should be limited to "using the integral, fastener-less feature(s)," as Defendants propose. [8] The parties also dispute whether the recited "assemble to and connect" must include "locating the picket with respect to the connector."

This is the same issue discussed above for the disputed term "projection," but is expanded to other language in the independent claims. The issue regarding whether the recited "projection" is limited to a "protruding structure that is fastener-less and integral to the connector/connector

---

[8] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 21-22); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pg. 32).

strip" was resolved above. Defendants do not provide a persuasive reason to read that language into this claim term, especially given that the term does not recite "projection." Moreover, Defendants do not provide a persuasive reason to redraft the term "assemble to and connect" to mean "locating the picket with respect to the connector."

The surrounding claim language recites how the fencing is assembled and connected. For example, Claim 1 of the '905 Patent recites that "each connector is coupled to a respective one of the plurality of pickets … wherein each connecter includes at least one projection and each picket includes at least one pivot hole for receiving the at least one projection." Similarly, Claim 1 of the '164 Patent recites that "each connector comprising an elongate strip with opposing first and second sides, … wherein at least one boss extends from the first side of the strip …wherein the at least one boss of each connector is inserted into the at least one pivot hole in a respective one of the plurality of pickets." Likewise, Claims 17 of the '164 Patent recite that "each connector comprising an elongate strip with opposing first and second sides, … wherein a series of bosses formed at regular spaced-apart intervals extend from the first side of the strip … wherein each boss of each connector is inserted into a respective one of the pivot holes in a respective one of the plurality of pickets."

Defendants fail to consider the term "assemble to and connect" in the context of the surrounding claim language. Thus, Defendants' construction is superfluous and unnecessary. Accordingly, Defendants failed to provide a persuasive reason for redrafting the language chosen by the patentees with their preferred language. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in the light of the intrinsic evidence.

## 2. Court's Construction

For the reasons set forth above, the term **"assemble to and connect"** is given its **plain and ordinary meaning.**

### E.  **"leading, inner edge of each rail is beveled to facilitate"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "leading, inner edge of each rail is beveled to facilitate" | Plain and ordinary meaning. | "the lower-most, inner edge of the side wall is beveled" |

#### 1.  Analysis

The phrase "leading, inner edge of each rail is beveled to facilitate" appears in Claims 1 and 17 of the '164 Patent; and in Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the phrase "leading, inner edge of each rail is beveled to facilitate" requires construction. [9]

Referring to Figures 3 and 4, the specification states the following regarding the purpose of the rail, the inner shelf, and the bevel:

---

[9] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 22-24); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pg. 32); Defendants' Reply Claim Construction Brief (ECF. No. 30, pgs. 15-17); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).



As shown in FIGS. 3 and 4, the rails 30 include at least one concealed ledge or shelf 32 for supporting a connector or boss strip 34 (or alternatively referred to as a dimpled strip) thereon. The shelf or shelves 32 extend inwardly from the inner surface of one or both sidewalls of the rail 30. Optionally, the lower leading edges of the shelf 32 (or another portion of the rail 30) can be chamfered, ramped, or beveled to facilitate a slight outward deflection and smooth movement over the boss strip 34 during assembly. Once in place, the boss strip 34 is securely held there by the shelf 32 with the boss strip supported by the shelf and secured in place between the shelf and the top wall of the rail 30. The boss strip 34 is captured between the corresponding sidewall of the rail 30 and the picket 20 but permitted to slide horizontally between the two and along the rail atop the shelf 32.

('965 Patent at 3:56–4:3). As indicated, the specification discloses that the beveled edge can be located on the edge of the shelf or another portion of the rail. In other words, the specification does not limit the location of the beveled edge. More importantly, the specification indicates that the purpose of the beveled edge is "to facilitate a slight outward deflection and smooth movement [of the rail] over the boss strip 34 during assembly." *Id.* Indeed, Claims 1 and 17 of the 164 Patent,

and Claim 1 of the 905 Patent recite that the "leading, inner edge of each rail is beveled to facilitate slipping the rail over the [respective] connector strip while the connector strip is connected to the pickets." Thus, the bevel is located on the "leading, inner edge of each rail" that facilitates slipping the rail over the connector strip. This is the plain language of the claims.

Defendants argue that the claim language should be redrafted to require the bevel to be on "the lower-most, inner edge of the side wall." Defendants contend that the patentee "clearly intends that the shelf be understood as a separate feature from the rail with the use of the disjuctive 'or another portion of the rail.'" (ECF No. 23, pg. 22) (citing '965 Patent at 3:60-62). According to Defendants, "the 'leading inner edge' is show below in an annotated version of Fig. 4 of the '965 Patent. The other 'leading edge,' depicted by the specification is that of the shelf":



(ECF No. 23, pg. 23). Defendants' argument is unpersuasive for several reasons. First, Defendants' construction would exclude the disclosed embodiment, which illustrates that the recited "leading, inner edge of each rail" is the edge of shelf  32 in Figure 4. Moreover, Defendants' construction

contradicts the surrounding claim language and specification, which indicates that the bevel is configured to facilitate slipping the rail over the connector strip. If the bevel is not on the leading, inner edge of the rail that comes into contact with the connector strip, then the bevel would not perform its recited purpose. Indeed, Defendants' construction completely drops "to facilitate" from the claim language, and is improper for at least this reason.

Finally, the claim language is broad, and Defendants' construction is an improper attempt to narrow the scope of the claims. Defendants do not provide a persuasive reason for redrafting "leading" to "lower most," or redrafting "inner edge of each rail" as "inner edge of the side wall." This redrafting of the claims is not "perfectly consistent with the intrinsic record," but instead improperly reads an unwarranted limitation into the claims. (ECF No. 23, pg. 24). When considered in the context of the surrounding claim language, the phrase "leading, inner edge of each rail is beveled to facilitate" is unambiguous, and is easily understandable by a jury, and should be given its plain and ordinary meaning. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in the light of the intrinsic evidence.

### 2. Court's Construction

For the reasons set forth above, the term **"leading, inner edge of each rail is beveled to facilitate"** is given its **plain and ordinary meaning.**

### F. "degree" Terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
| --- | --- | --- |
| "at least about 20 degrees in each direction" | Plain and ordinary meaning. | "an angle from vertical of 19 degrees or more in each direction" |
| "at least about 25 degrees in each direction" | Plain and ordinary meaning. | "an angle from vertical of 24 degrees or more in each direction" |

| "at least about 30 degrees in each direction" | Plain and ordinary meaning. | "an angle from vertical of 29 degrees or more in each direction" |
|---|---|---|

### 1. Analysis

The phrase "at least about 20 degrees in each direction" appears in Claim 1 of the '965 Patent; Claims 1 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "at least about 25 degrees in each direction" appears in Claim 2 of the '965 Patent; Claim 2 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "at least about 30 degrees in each direction" appears in Claim 3 of the '965 Patent; Claim 3 of the '164 Patent; and Claim 2 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree that the term "at least about 20" means "19 degrees or more." The parties dispute whether the "degree" terms should be construed to include a frame of reference.[10]

Defendants argue that the "degrees" terms lack a frame of reference from which "each direction" is measured. (ECF No. 23, pg. 24) (citing ECF No. 23-1, pg. 87-88 (Pratt Dec., para. 102)). Defendants contend that those skilled in the mechanical arts routinely measure angles of components by reference to an initial starting point of the component. (*Id.,* pgs. 24-25). Referring to Figures 7A-7D, Defendants argue that the specification depicts the referenced angles in reference to the vertical starting position of the picket. (*Id.*, pg. 25).

---

[10] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 24-26); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pgs. 31-32); Defendants' Reply Claim Construction Brief (ECF. No. 30, pgs. 19-20); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).



According to Defendants, their "proposed construction is necessary to resolve a potentially fatal ambiguity in the claim." (*Id.*). Thus, Defendants contend that the proper construction for the "degrees" terms is "an angle from vertical of [X] degrees or more in each direction." (*Id.,* pg. 26).

The Court agrees with Defendants. As shown above, the specification indicates that the recited angles are referenced to the vertical starting position of the picket. Indeed, the specification does not indicate or suggest measuring from any other reference point. Moreover, Defendants correctly contend that if the measurement were taken "relative to the rails" as the claim language states, then the prior art identified in Figs. 7A and 7B would have a measured value of 75 degrees and fall within the scope of the claims. (*Id.*). This would be incorrect, because the specification explicitly compared the recited angle to the prior art as reference from a vertical starting position. Specifically, the specification states that "utilizing the present invention permits the pickets 20 to

rotate about the boss 36 at least 36 degrees (as compared to the known railing assembly's typical rotational limit of about 15 degrees), using a similar opening gap between the picket and the edge of the picket opening in the railing--the additional freedom of motion is not due to simply making the opening larger." ('965 Patent at 6:9–16). Accordingly, the Court adopts Defendants' construction.

Plaintiff contends that there is "no justification for adding the 'from vertical' limitation to the claim term." (ECF No. 48, pgs. 31-32) (citing '905 Patent at 6:12–18, 6:21–28, and Figures. 7C-7D). Contrary to Plaintiff's contention, a person of ordinary skill in the art would understand that the intrinsic evidence indicates that the recited angles are referenced to the vertical starting position of the picket. During the claim construction hearing, Plaintiff argued that the term "vertical" is ambiguous, and that the angle should be measured between the picket and the rail. Plaintiff's argument contradicts the intrinsic record, and is improper. Indeed, Plaintiff's proposal would encompass the prior art of 15 degrees from the vertical starting position by redrafting the claim language to the complementary angle. In other words, an angle that is "*at least* about 20 degrees" between the picket and the rail, includes an angle that is 75 degrees between the picket and the rail, because of the "at least" language. As illustrated below, this is the prior art.



('965 Patent at Figure 7A) (annotated). As illustrated in the specification, "vertical" refers to the vertical starting position of the picket before rotation. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in the light of the intrinsic evidence.

### 2. Court's Construction

For the reasons set forth above, the Court construes the phrase **"at least about 20 degrees in each direction"** to mean **"an angle from vertical of 19 degrees or more in each direction,"** the phrase **"at least about 25 degrees in each direction"** to mean **"an angle from vertical of 24 degrees or more in each direction,"** and the phrase **"at least about 30 degrees in each direction"** to mean **"an angle from vertical of 29 degrees or more in each direction."**

### G. "picket openings"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "picket openings" | Plain and ordinary meaning. | "openings receiving a picket that are sized to contact the picket when the picket is rotated about 15 degrees or less in either direction" |

### 1. Analysis

The term "picket openings" appears in Claim 1 of the '965 Patent; Claims 1 and 6 of the '332 Patent; Claims 1 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree that the term "picket openings" means "opening receiving a picket." The parties dispute whether the construction should further include requiring that the opening "are sized to contact the picket when the picket is rotated about 15 degrees or less in either

direction." [11]

The claims recite that each rail includes a plurality of picket openings that each receives a picket. Defendants argue that during the prosecution history the patentees excluded picket openings that are larger than those that are sized to contact the picket when the picket is rotated about 15 degrees in either direction. (ECF No. 23, pg. 26). Defendants contend that the patentees argued that "the connectors of the presently claimed invention are caused to move relative to the rails after the pickets engage the sides (either left or right depending on the pivoting direction) of the opening of the rails." (*Id.*) (citing ECF No. 23-1, pg. 180 (Response to Office Action dated 09/19/2013)). According to Defendants, the patentees excluded picket openings that are larger than those that are sized to contact the picket when the picket is rotated about 15 degrees in either direction. (ECF No. 23, pg. 26) (citing *Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016)).

The Court disagrees with Defendants' analysis. Notably, the prosecution history does not state or indicate that the patentees clearly and unmistakably limited the term "picket openings" as Defendants contend. *Thorner*, 669 F.3d at 1366-67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer."). Specifically, the patentees argued the following regarding the picket openings:

---

[11] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 26-29); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pg. 33); Defendants' Reply Claim Construction Brief (ECF. No. 30, pg. 19); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).

By contrast, the connectors of the presently claimed invention are caused to move relative to the rails after the pickets engage the sides (either left or right depending on the pivoting direction) of the openings of the rails, which provides for a portion of the range of motion of the pivoting of the pickets. Thus, as claimed, the range of motion of the pivoting of the pickets relative to the rail is attained by a combination of freedom of motion between the pickets relative to the openings of the rails and the sliding motion of the sliding connectors relative to the rails. This is not described or suggested by the prior art references, either singly or in combination. Accordingly, Applicants believe that the grounds of rejection are overcome and the application is in condition for allowance.

(ECF No. 23-1, pg. 180) (highlight added). As indicated, the patentees distinguished the prior art not based solely on the size of the openings, but instead argued that "the range of motion of the pivoting of the pickets relative to the rail is attained *by a combination of freedom of motion between the pickets relative to the openings of the rails and the sliding motion of the sliding connectors relative to the rails.*" (*Id.*) (emphasis added). To be sure, the prosecution history does not mention "15 degrees" or limit the size of the openings, as Defendants contend. Accordingly, the patentees did not clearly and unmistakably limit the term "picket openings," as Defendants propose.

Defendants further argue that the patentees implicitly defined the term picket openings "by relying on the criticality of the size of the picket openings relative to the size of the pickets in touting the advantages and of the invention and distinguishing it over the prior art." (ECF No. 23, pg. 27) (citing '965 Patent at Abstract, 1:30–34, 5:47–55, 6:6–16, Figures 7A-7D). Defendants contend that merely increasing the size of the picket openings is not the invention and would not be patentable.(ECF No. 23, pg. 27). According to Defendants, the more precisely stated advantage of the invention is to provide a greater rake angle without increasing the size of the picket opening. (*Id.*) (citing '965 Patent at 6:6–9).

The Court disagrees with Defendants' self-serving characterization of the invention. As

indicated above, the advantage of the invention is that "the range of motion of the pivoting of the pickets relative to the rail is attained *by a combination of freedom of motion between the pickets relative to the openings of the rails and the sliding motion of the sliding connectors relative to the rails.*" (ECF No. 23-1, pg. 180) (emphasis added). Indeed, the specification explicitly states that "[t]he sliding, pivotal connection allows the pickets to be oriented at greater angles relative to the rails (i.e., it allows the assembly to rack to a greater degree, thereby allowing the fencing/raining to follow more steeply changing terrain or contours)." ('965 Patent at 1:30–34).

Defendants alleged disclaimer focuses only on the picket openings, to the exclusion of the sliding connection, which is the stated improvement. The specification's description of the size of the picket openings compared to the pickets of prior art systems in terms of the angle was to highlight the advantage of the sliding connection, and was "not due to simply making the opening larger." ('965 Patent at 6:10–16). Furthermore, the patentees' description of the prior art is not to limit the size of the picket openings, but instead is to highlight the advantage that the sliding connection provides when the picket opening is held constant. (*Id.* at 5:60–63, Figures 7A-7D). Contrary to Defendants' contention, the patentees did not indicate that the size of the picket is "critical" or should be limited as Defendants propose. *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) ("[C]omparing and contrasting the present technique to that of the prior art does not 'rise to the level of [a] clear disavowal' of claim scope.") (quoting *Thorner*, 669 F.3d at 1366).

The specification states that the invention permits greater rack angles for the pickets while "the pickets and picket openings are the same size as in prior art systems." ('965 Patent at 6:8–9). Contrary to Defendants' construction, the patentees did not rely on "the picket openings being no larger than prior art picket openings as an essential feature distinguishing over the prior art." (ECF

No. 23, pg. 29). Instead, as recited in the claims, it is the combination of the picket openings with the slidable connector. Indeed, Defendants concede that their proposed construction is not "explicitly claimed." (*Id.*, pg. 26). Accordingly, the Court finds that Defendants' construction is an improper attempt to read an unwarranted limitation into the claims.

### 2.  Court's Construction

For the reasons set forth above, the Court construes the term **"picket openings"** to mean **"openings for receiving a picket."**

### H.  "sliding" Terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "sliding surface" | Plain and ordinary meaning. | Indefinite. |
| "slidably engaged" | Plain and ordinary meaning. | Indefinite. |
| "slidably connected" | Plain and ordinary meaning. | Indefinite. |
| "slidable connection" | Plain and ordinary meaning. | Indefinite. |
| "permit a sliding motion" | Plain and ordinary meaning. | Indefinite. |
| "permit a combination pivoting and sliding motion" | Plain and ordinary meaning. | Indefinite. |
| "permits a sliding motion therebetween" | Plain and ordinary meaning. | Indefinite. |
| "wherein each connector provides . . . . a slidable connection to the respective rail to permit a sliding motion therebetween, to permit a combination pivoting and sliding motion between the rail and the picket" | Plain and ordinary meaning. | Indefinite. |
| "pivotal connection of each connector to the respective picket permits pivoting of the connector relative to the respective picket but not sliding of the connector relative to the respective picket" | Plain and ordinary meaning. | Indefinite. |
| "sliding connection of each connector to the respective rail permits sliding of the connector relative to the respective rail but not pivoting of the connector relative to the respective rail" | Plain and ordinary meaning. | Indefinite. |

| "the pivotal range of the plurality of pickets relative to the plurality of rails is attained by the combination pivoting and sliding motion therebetween resulting from a combination of the pivoting motion between the connectors relative to the pickets and the sliding motion of the connectors relative to the rails" | Plain and ordinary meaning. | Indefinite. |
|---|---|---|
| "a sliding surface is formed on the second side" | Plain and ordinary meaning. | Indefinite. |
| "slidably engaged with" | Plain and ordinary meaning. | Indefinite. |

### 1.  Analysis

The term "sliding surface" appears in Claim 1 of the '965 Patent; Claims 1 and 6 of the '332 Patent; Claims 1 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "slidably engaged" appears in Claim 1 of the '965 Patent; Claim 1 of the '332 Patent; Claims 1 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "slidably connected" appears in Claim 1 of the '905 Patent. The term "slidable connection" appears in Claims 1 and 17 of the '164 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The phrase "permit a sliding motion" appears in Claim 1 of the '905 Patent. The phrase "permit a combination pivoting and sliding motion" appears in Claim 1 of the '905 Patent. The phrase "permits a sliding motion therebetween" appears in Claim 9 of the '965 Patent; Claim 18 of the '164 Patent; and Claim 6 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "wherein each connector provides . . . a slidable connection to the respective rail to permit a sliding motion therebetween, to permit a combination pivoting and sliding motion between the

rail and the picket" appears in Claim 1 and 17 of the '164 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "pivotal connection of each connector to the respective picket permits pivoting of the connector relative to the respective picket but not sliding of the connector relative to the respective picket" appears in Claims 12 of the '164 Patent; and Claim 10 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

The phrase "sliding connection of each connector to the respective rail permits sliding of the connector relative to the respective rail but not pivoting of the connector relative to the respective rail" appears in Claim 13 of the '164 Patent; and Claim 11 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "the pivotal range of the plurality of pickets relative to the plurality of rails is attained by the combination pivoting and sliding motion therebetween resulting from a combination of the pivoting motion between the connectors relative to the pickets and the sliding motion of the connectors relative to the rails" appears in Claim 14 of the '164 Patent, and Claim 12 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

The phrase "a sliding surface is formed on the second side" appears in Claim 1 of the '965 Patent; Claim 1 of the '332 Patent; and Claims 1 and 17 of the '164 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "slidably engaged with" appears in Claim 1 of the '965 Patent; Claims 1 and 6 of the '332 Patent; and Claims 1 and 17 of the '164 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

The parties dispute whether the "sliding" terms are indefinite for failing to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.[12] Specifically, Defendants contend that the "sliding terms" do not have a recognized meaning in the art. (ECF No. 23, pg. 29) (citing ECF No. 23-1, pgs. 64-65 (Pratt Dec., para. 43); ECF No. 23-1, pg. 149 (Deposition of Gordon Duffy, lns. 16-9)). Defendants argue that those of ordinary skill in the art will generally look for guidance on certain "fundamental parameters" relating to the interaction of two components to determine if they are "slidably connected." (ECF No. 23, pg. 30) (citing ECF No. 23-1. Pg. 65-67 (Pratt Dec., para. 42)). Defendants further contend that the specification fails to provide any useful guidance on important parameters, and only makes bare conclusory statements of the sliding function. (ECF No. 23, pg. 30) (citing '965 Patent at 1:50–57). Defendants also argue that the "sliding" terms are functional claim language, because they attempt to define something "by what it does rather than what it is." (ECF No. 23, pg. 30) (citing *Nevro Corp.*, 955 F.3d at 39).

To support their position, Defendants cite to *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008), and argue that the Federal Circuit explained that "[t]he claim term might also be sufficiently definite if the specification provided a formula for calculating a property along with examples that meet the claim limitation and examples that do not." (ECF No. 23, pg. 31) (citing *Id.* at 1255-56). Defendants argue that the Asserted Patents do not provide any example calculations, formulas, or any form of quantitative guidance for the "sliding" terms. (ECF No. 23, pg. 31) (citing ECF No. 23-1, pg. 92 (Pratt Dec., para. 42-44)). According to Defendants, the

---

[12] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 29-31); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pgs. 24-27); Defendants' Reply Claim Construction Brief (ECF. No. 30, pgs. 12-15); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).

absence of such "fundamental parameters," and the lack of any definitive guidance on determining such parameters makes it such that those of ordinary skill in the art cannot "determine the scope of the invention with reasonable certainty." (ECF No. 23, pg. 31) (citing *Nautilus*, 572 U.S. at 910).

The Court disagrees that Defendants proved by clear and convincing evidence that the "sliding" terms are indefinite. In *Haliburton*, the court noted "that 'there is nothing intrinsically wrong' with using functional language in claims," and "that the task of determining whether [a functional] limitation is sufficiently definite is a difficult one that is highly dependent on context." *Halliburton*, 514 F.3d at 1255 (citing *Swinehart*, 439 F.2d at 212-13). Here, the context of the surrounding claim language and the specification resolve any of the alleged difficulties. The claims generally recite that a connector is both "pivotably connected" to the pickets, as well as "slidably connected" or "slidably engaged" to the respective rail. This is illustrated in an annotated Figures 7C-7D below:



('965 Patent at Figures 7A-7D) (annotated). The specification describes this connection as

follows

> [T]he present invention utilizes *a sliding pivotal connection* between the pickets 20 and the rails 30 that is very easy and fast to install and allows for limited horizontal movement of the pickets 20 along the rails 30. In particular, *the connector boss strip 34 slides within the rail 30 in the transverse directions denoted by the arrows X when the pickets 20 are pivoted in the angular directions denoted by the arrows Y, thereby allowing the pivot point between the connector hole 22 of the picket and the rail to slide one way or the other, as shown in FIGS. 7C-7D.* Because of this, the picket 20 is afforded a higher degree of rotation within the picket openings 39 of the rail, while the pickets and picket openings are the same size as in prior art systems.

(*Id.* at 5:64–6:9) (emphasis added). Similarly, the specification states that "the railings 30 each

have an inner profile that is sized and shaped to retain the connector or boss strip 34 between the

rail and the picket *while permitting it to slide and pivot relative to the pickets*. With this construction, a sliding, pivoting connection is obtained and also concealed." ('965 Patent at 4:35–40) (emphasis added); *see also id.* at 3:67–4:3 ("The boss strip 34 is captured between the corresponding sidewall of the rail 30 and the picket 20 but permitted to slide horizontally between the two and along the rail atop the shelf 32.").

When considered in the context of the intrinsic evidence, a person of ordinary skill in the art would understand that the term "sliding" means "relative movement while in contact with another surface." Indeed, the parties agreed to this construction during the Claim Construction Hearing, as discussed above. The claim language further recites the elements that are "slidably engaged" or "slidably connected," and the specification illustrates this connection in annotated Figures 7C and 7D above with the "X" notation. The annotated Figure 7C and 7D further indicates the relative movement of the parts by the annotated "Delta X."

In contrast, the prior art Figures 7A and 7B do not have this relative movement, but instead only show a pivoting connection at "S." The specification explicitly highlights this distinction by stating that "[t]he *sliding, pivotal connection* allows the pickets to be oriented at greater angles relative to the rails (i.e., it allows the assembly to rack to a greater degree, thereby allowing the fencing/raining to follow more steeply changing terrain or contours)." ('965 Patent at 1:30–34) (emphasis added). Accordingly, the Court finds that the disputed phrase, when read in the light of the specification delineating the patent and the prosecution history, informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Specifically, the term "sliding surface" means "surface that allows sliding," and the term "sliding motion" means "a motion that includes sliding." Likewise, the terms "slidably engaged"

and "slidably connected" mean "connected in a manner that allows sliding;" and the term "slidable connection" means "connection that allows sliding." The phrase "permit a sliding motion" means "permit a motion that includes sliding," and the phrase "permit a combination pivoting and sliding motion" means "permit a motion that includes a combination of pivoting and sliding." The other terms in the disputed phrases are given their plain and ordinary meaning.

In summary, Defendants' indefiniteness argument rests on the incorrect premise that the "sliding" terms must be described with calculations or formulas to be definite. (ECF No. 23, pgs. 30-31). Contrary to Defendants' contention, the "fundamental parameters" identified by Defendants are not required for a claim to be definite given the intrinsic record in this case. *Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) ("As the Supreme Court recognized in *Nautilus*, 'absolute precision' in claim language is 'unattainable.'") (citing *Nautilus*, 134 S. Ct. at 2129).

Likewise, the "sliding" terms are not indefinite simply because they may be broad and may cover many variations. *See e.g., Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2010) (stating that claiming broadly does not "prevent the public from understanding the scope of the patent"); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005) (stating "breadth is not indefiniteness"). Accordingly, the Court finds that Defendants failed to prove by clear and convincing evidence that the "sliding" terms are indefinite. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in light the of the intrinsic evidence.

## 2. Court's Construction

For the reasons set forth above, the Court construes the term **"sliding surface"** to mean **"surface that allows sliding;"** the terms **"slidably engaged"** and **"slidably connected"** to mean

**"connected in a manner that allows sliding;"** the terms **"slidable connection"** and **"sliding connection"** to mean **"connection that allows sliding;"** and the term **"sliding motion"** to mean **"a motion that includes sliding."** The Court construes the phrase **"permit a sliding motion"** to mean **"permit a motion that includes sliding;"** the phrase **"permit a combination pivoting and sliding motion"** to mean **"permit a motion that includes a combination of pivoting and sliding;"** and the phrase **"permits a sliding motion therebetween"** to mean **"permit a motion that includes sliding."** The other terms in the disputed phrases are given **their plain and ordinary meaning.**

### I.   "causes" Terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "pivoting . . . causes the respective connector to slide along the inner surface . . . and vice versa" | Plain and ordinary meaning. | Indefinite. |
| "pivotal connection of each connector to the respective picket permits pivoting of the connector relative to the respective picket but not sliding of the connector relative to the respective picket" | Plain and ordinary meaning. | Indefinite. |
| "pivoting . . . causes the respective connector to slide along the respective rail. . . and vice versa" | Plain and ordinary meaning. | Indefinite. |
| "pivoting . . . first and second elongate rails causes the first and second connector strips to slide along the inner surfaces of the respective side walls of the first and second elongate rails. . . and vice versa" | Plain and ordinary meaning. | Indefinite. |

### 1.   Analysis

The phrase "pivoting . . . causes the respective connector to slide along the inner surface . . . and vice versa" appears in Claim 1 of the '965 Patent; and Claims 1 and 17 of the '164 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "pivotal connection of each connector to the respective

picket permits pivoting of the connector relative to the respective picket but not sliding of the connector relative to the respective picket" appears in Claim 12 of the '164 Patent; and Claim 10 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "pivoting . . . causes the respective connector to slide along the respective rail. . . and vice versa" appears in Claim 1 of the '905 Patent. The phrase "pivoting . . . first and second elongate rails causes the first and second connector strips to slide along the inner surfaces of the respective side walls of the first and second elongate rails. . . and vice versa" appears in Claim 6 of the '332 Patent.

The parties dispute whether the "causes" terms are indefinite for failing to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.[13] Specifically, Defendants contend that the terms are indefinite, because the patentees affirmatively disclaimed the plain and ordinary meaning of the word "causes." According to Defendants, the term "causes" implies a one-to-one relationship between two occurrences. (ECF No. 23, pg. 32). Defendants argue that the patentees disclaimed this definition during the prosecution of the '075 Patent when the patentees explained that "the connectors of the presently claimed invention are <u>caused</u> to move relative to the rails <u>after the pickets engaged the sides</u> … <u>of the openings of the rails.</u>" (*Id.* at 32) (citing ECF No. 23-1 at 180 (Response to Office Action dated 09/19/2013 of '075 Patent) (emphasis added)). Defendants contend that the patentees were stating that the pivoting motion of the picket does not "cause" the connector to move, but only continuing to pivot the picket after the edge of the picket contacts the edge of the opening in the rail, is what

---

[13] The parties' arguments for this disputed term can be found in Defendants' Opening Claim Construction Brief (ECF. No. 23, pgs. 31-34); Plaintiff's Opening Claim Construction Brief (ECF. No. 48, pg. 31); Defendants' Reply Claim Construction Brief (ECF. No. 30, pgs. 17-19); and Plaintiff's Reply Claim Construction Brief (ECF. No. 50, pgs. 1-3).

causes the connector to move. (ECF No. 23 at 32). Defendants argue that construing "causes" as having its plain meaning violates the doctrine of prosecution disclaimer. (*Id.* at 32).

The Court disagrees that Defendants proved by clear and convincing evidence that the "causing" terms are indefinite. Contrary to Defendants' contention, the patentees did not disclaim the plain and ordinary meaning of "causes." Instead, the patentees distinguished the prior art references because they did not "disclose or suggest *any* sliding motion of the connectors relative to the rails." (ECF No. 23-1 at 179) (emphasis added). Indeed, the claims were amended to recite that "the pivoting of the pickets relative to the rails is attained by a combination of freedom of motion between the pickets relative to the openings of the rails and the sliding motion of the sliding connectors relative to the rails." (*Id.*). Thus, the patentees distinguished the prior art because it did not exhibit "*any* sliding motion." (*Id.* at 179-180) (emphasis added). The patentees put this in context in the sentence directly after the sentence quoted by Defendants. Specifically, the patentees argued that "as claimed, the range of motion of the pivoting of the pickets relative to the rail is attained *by a combination of freedom of motion between the pickets relative to the openings of the rails and the sliding motion of the sliding connectors relative to the rails.*" (*Id.* at 180) (emphasis added). This is illustrated in an annotated Figures 7C-7D below:



('965 Patent at Figures 7A-7D) (annotated). The specification describes how the sliding pivotal

connection is configured to "cause" sliding:

> [T]he present invention utilizes *a sliding pivotal connection* between the pickets 20 and the rails 30 that is very easy and fast to install and allows for limited horizontal movement of the pickets 20 along the rails 30. In particular, *the connector boss strip 34 slides within the rail 30 in the transverse directions denoted by the arrows X when the pickets 20 are pivoted in the angular directions denoted by the arrows Y, thereby allowing the pivot point between the connector hole 22 of the picket and the rail to slide one way or the other, as shown in FIGS. 7C-7D.* Because of this, the picket 20 is afforded a higher degree of rotation within the picket openings 39 of the rail, while the pickets and picket openings are the same size as in prior art systems.

(*Id.* at 5:64–6:9) (emphasis added). Similarly, the specification states that "the railings 30 each

have an inner profile that is sized and shaped to retain the connector or boss strip 34 between the rail and the picket *while permitting it to slide and pivot relative to the pickets*. With this construction, a sliding, pivoting connection is obtained and also concealed." *Id.* at 4:35–40 (emphasis added), *see also id.* at 3:67–4:3 ("The boss strip 34 is captured between the corresponding sidewall of the rail 30 and the picket 20 but permitted to slide horizontally between the two and along the rail atop the shelf 32.").

When considered in the context of the intrinsic evidence, a person of ordinary skill in the art would understand that the term "causing" is used in its plain and ordinary meaning. As argued by the patentees during the prosecution history, the prior art only disclosed a pivotable connection that could not slide. Indeed, the claim language recites a connection that is both pivotable and slidable. The specification discloses how the connection can both pivot and slide in annotated Figures 7C and 7D above with the "X" and "Y" notations. The annotated Figure 7C and 7D further indicate the relative movement of the parts by the annotated "Delta X" and the "36º."

In contrast, the connection of the prior art did not slide, but instead only pivoted, as illustrated by the screw labeled "S" and "15º" in Figures 7A and 7B. The specification explicitly highlights this distinction by stating that "[t]he *sliding, pivotal connection* allows the pickets to be oriented at greater angles relative to the rails (i.e., it allows the assembly to rack to a greater degree, thereby allowing the fencing/raining to follow more steeply changing terrain or contours)." (*Id.* at 1:30–34 (emphasis added)).

In summary, Defendants' indefiniteness argument rests on an incorrect and incomplete characterization of the prosecution history. As discussed above, the patentees did not clearly and unmistakably disclaim the plain and ordinary meaning of "causes." *Thorner*, 669 F.3d at 1366-67 ("To constitute disclaimer, there must be a clear and unmistakable disclaimer." ). Accordingly, the

Court finds that Defendants failed to prove by clear and convincing evidence that the "causes" terms are indefinite. The disputed phrases, when read in the light of the specification delineating the patent and the prosecution history, informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, 134 S. Ct. at 2124. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in light the of the intrinsic evidence.

### 2. Court's Construction

For the reasons set forth above, the phrases  phrase **"pivoting . . . causes the respective connector to slide along the inner surface . . . and vice versa;"** the phrase **"pivotal connection of each connector to the respective picket permits pivoting of the connector relative to the respective picket but not sliding of the connector relative to the respective picket;"** the phrase **"pivoting . . . causes the respective connector to slide along the respective rail. . . and vice versa;** and the phrase **"pivoting . . . first and second elongate rails causes the first and second connector strips to slide along the inner surfaces of the respective side walls of the first and second elongate rails. . . and vice versa"** are not indefinite, and are given their **plain and ordinary meaning**.

### J. "pivotal range" Terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "pivotal range of the plurality of pickets relative to the plurality of rails is at least about 20 degrees in each direction" | Plain and ordinary meaning. | Indefinite. |
| "pivotal range of the plurality of pickets relative to the plurality of rails is at least about 25 degrees in each direction" | Plain and ordinary meaning. | Indefinite. |
| "pivotal range of the plurality of pickets . . . is at least about 30 degrees in each direction" | Plain and ordinary meaning. | Indefinite. |
| "the pivotal range of the pickets relative to the rails is not limited by interaction of the one or more connectors with the pickets" | Plain and ordinary meaning. | Indefinite. |

1.  **Analysis**

The phrase "pivotal range of the plurality of pickets relative to the plurality of rails is at least about 20 degrees in each direction" appears in Claim 1 of the '965 Patent; Claims 1 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "pivotal range of the plurality of pickets relative to the plurality of rails is at least about 25 degrees in each direction" appears in Claim 2 of the '965 Patent; Claim 2 of the '164 Patent, and Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "pivotal range of the plurality of pickets . . . is at least about 30 degrees in each direction" appears in Claim 3 of the '965 Patent; Claim 3 of the '164 Patent; and Claim 2 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "the pivotal range of the pickets relative to the rails is not limited by interaction of the one or more connectors with the pickets" appears in Claim 5 of the '965 Patent; Claims 5 and 17 of the '164 Patent; and Claim 1 of the '905 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

The parties dispute whether the "pivotal range" terms are indefinite for failing to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.[14] Defendants contend that the terms are indefinite, because the "combination" limitation requires the "pivotal range" be attributable to a "combination pivoting and sliding motion." (ECF No. 23 at 35). According to Defendants, the Asserted Patents do not provide any

---

[14] Defendants were the only party to brief these terms (ECF. No. 23, pgs. 35-36; ECF. No. 30, pg. 20).

guidance as to an expected or minimum ratio of sliding and pivoting that makes up the "pivotal range." (*Id.*) (citing ECF No., pg. 85 (Pratt Dec. para. 96, 97)). Defendants note that not all of the "pivotal range" terms use the "combination" limitation explicitly, but argue that a person of ordinary skill in the art would understand that the pivotal range is achieved by a combination of the pivoting and sliding motions, because of the phrase "in a manner such that." (ECF No. 23, pg. 35) (citing ECF No. 23-1, pg. 87 (Pratt Dec., para. 105)).

To support their position, Defendants cite to *Dow Chemical Co. v. Nova Chemicals Corp. (Canada),* 803 F.3d 620, 630-31 (Fed. Cir. 2015), and argue that the Federal Circuit found that a term in that case was indefinite because "[n]either the patent claims nor the specification here discusses the four methods or provides any guidance as to which method should be used or even whether the possible universe of methods is limited to these four methods." (ECF No. 23, pg. 36) (citing *Id.* at 634). Defendants contend that Plaintiff failed to provide "any standards, examples, formula, or any way for one of ordinary skill in the art to determine with any certainty what an acceptable range of ratios or 'combinations' of pivoting to sliding motions that fall within the scope of the claims." (ECF No. 23 at 36).

The Court disagrees that Defendants proved by clear and convincing evidence that the "pivotal range" terms are indefinite. In *Dow*, the court pointed to a lack of disclosure in the specification. Specifically, the court stated that "[a]lthough the patents state that 'FIG. 1 shows the various stages of the stress/strain curve used to calculate the slope of strain hardening,' … *the patents do not contain the FIG. 1 referenced in those passages. Nor do the patents include any other figure showing the stress/strain curve.*" *Dow*, 803 F.3d at 633 (emphasis added). Unlike *Dow*, the intrinsic evidence clearly illustrates the "combination" of pivoting and sliding. The claims generally recite that a connector is both "pivotably connected" to the pickets, as well as

"slidably connected" or "slidably engaged" to the respective rail. This is illustrated in an annotated

Figures 7C-7D below:

('965 Patent at Figures 7A-7D) (annotated). The specification describes this connection as

follows:

> [T]he present invention utilizes *a sliding pivotal connection* between
> the pickets 20 and the rails 30 that is very easy and fast to install and
> allows for limited horizontal movement of the pickets 20 along the
> rails 30. In particular, *the connector boss strip 34 slides within the*
> *rail 30 in the transverse directions denoted by the arrows X when*
> *the pickets 20 are pivoted in the angular directions denoted by the*
> *arrows Y, thereby allowing the pivot point between the connector*



> hole 22 of the picket and the rail to slide one way or the other, as
> shown in FIGS. 7C-7D. Because of this, the picket 20 is afforded a
> higher degree of rotation within the picket openings 39 of the rail,

> while the pickets and picket openings are the same size as in prior
> art systems.

(*Id.* at 5:64–6:9) (emphasis added). Similarly, the specification states that "the railings 30 each have an inner profile that is sized and shaped to retain the connector or boss strip 34 between the rail and the picket *while permitting it to slide and pivot relative to the pickets*. With this construction, a sliding, pivoting connection is obtained and also concealed." (*Id.* at 4:35–40 (emphasis added); *see also id.* at 3:67–4:3 ("The boss strip 34 is captured between the corresponding sidewall of the rail 30 and the picket 20 but permitted to slide horizontally between the two and along the rail atop the shelf 32.")).

When considered in the context of the intrinsic evidence, a person of ordinary skill in the art would understand that the "pivotal range" terms are achieved by a combination of pivoting and sliding. The specification discloses how the connection can both pivot and slide in annotated Figures 7C and 7D above with the "X" and "Y" notations. The annotated Figure 7C and 7D further indicate the relative movement of the parts by the annotated "Delta X" and the "36º." In contrast, the connection of the prior art did not slide, but instead only pivoted, as illustrated by the screw labeled "S" and "15º" in Figures 7A and 7B. The specification explicitly highlights this distinction by stating that "[t]he *sliding, pivotal connection* allows the pickets to be oriented at greater angles relative to the rails (i.e., it allows the assembly to rack to a greater degree, thereby allowing the fencing/raining to follow more steeply changing terrain or contours)." ('965 Patent at 1:30–34) (emphasis added). Thus, Defendants failed to show by clear and convincing evidence that a person of ordinary skill in the art would not be able to determine whether a device meets the "pivotal range" limitation. Accordingly, the Court finds that the disputed phrases, when read in the light of the specification delineating the patent and the prosecution history, informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, 134 S. Ct. at 2124 .

In summary, Defendants' indefiniteness argument rests on the incorrect premise that the "pivotal range" terms must be described with calculations or formulas to be definite (ECF No. 23, pgs. 30-31). Contrary to Defendants' contention, a specific ratio is not required for a claim to be definite given the intrinsic record in this case. *Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) ("As the Supreme Court recognized in *Nautilus*, 'absolute precision' in claim language is 'unattainable.'") (citing *Nautilus*, 134 S. Ct. at 2129).

Likewise, the "pivotal range" terms are not indefinite simply because they may be broad and may cover many variations. *See e.g., Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2010) (stating that claiming broadly does not "prevent the public from understanding the scope of the patent"); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005) (stating "breadth is not indefiniteness"). Accordingly, the Court finds that Defendants failed to prove by clear and convincing evidence that the "pivotal range" terms are indefinite. Finally, in reaching its conclusion, the Court considered the extrinsic evidence submitted by the parties, and given it its proper weight in light the of the intrinsic evidence.

## 2.   Court's Construction

The Court finds that the phrase **"pivotal range of the plurality of pickets relative to the plurality of rails is at least about 20 degrees in each direction;"** and the phrase **"pivotal range of the plurality of pickets relative to the plurality of rails is at least about 25 degrees in each direction;"** the phrase **"pivotal range of the plurality of pickets . . . is at least about 30 degrees in each direction;"** and the phrase **"the pivotal range of the pickets relative to the rails is not limited by interaction of the one or more connectors with the pickets"** are not indefinite, and are given their **plain and ordinary meaning**.

## VI.    CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SO ORDERED:** August 25, 2023.

Ada Brown
UNITED STATES DISTRICT JUDGE